CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS   2017 FEB -9   AM 10: 32
FORT WORTH DIVISION

DEPUTY CLERK _____

| | | |
|---|---|---|
| CONNIE JORGENSEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 4:15-CV-0889-O-BL |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of a decision of the Com-

missioner of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") under Title II and Part A of Title XVIII of the Social Security Act and Sup-

plemental Security Income ("SSI") under Titles XVI and XIX of the Act.[2]  *See* Compl. (doc. 1)

(seeking judicial review but not specifying the particular provisions).  The Commissioner has filed

an answer, *see* Def.'s Answer (doc. 10), and a certified copy of the transcript of the administrative

proceedings, *see* SSA Admin. R. [hereinafter "R."] (docs. 12-14), including the hearing before the

Administrative Law Judge ("ALJ").  The parties have briefed the issues. *See* Pl.'s Appeal (doc. 16);

Def.'s Resp. (doc. 17); Pl.'s Reply (doc. 18).  The United States District Judge referred the case to

---

[1]On January 20, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security.  In accordance with Fed. R. Civ. P. 25(d), the Court automatically substitutes her as the named defendant.

[2]Title II governs disability insurance benefits, *see* 42 U.S.C. §§ 401-34; Title XVI governs supplemental security income for the aged, blind, and disabled, *see id.* §§ 1381-1383f; Title XVIII governs the Medicare program, *see id.* §§ 1395-1395lll; and Title XIX governs the Medicaid program, *see id.* §§ 1396-1396w-5.  Final determinations under Title XVI are subject to the same judicial review as provided in § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  Similarly, § 405(g) provides the only basis for judicial review of adverse decisions under Title XVIII, *see Citadel Healthcare Servs. Inc. v. Sebelius*, No. 3:10-CV-1077-BH, 2010 WL 5101389, at *2-4 (N.D. Tex. Dec. 8, 2010), and the courts apply § 405(g) to Title XIX claims, *see Duret v. Comm'r of Soc. Sec. Admin.*, No. 13-00314-BAJ, 2014 WL 4690228, at *3 (M.D. La. Sept. 22, 2014).

the undersigned pursuant to 28 U.S.C. § 636. After considering the pleadings, briefs, and administrative record, the undersigned recommends that the Commissioner's decision be reversed and remanded for further consideration.

## I.   BACKGROUND

Plaintiff initially claimed disability due to herniated discs, spinal stenosis, cancer, diabetes, and vision problems. R. 74, 85, 251. She filed applications for DIB and SSI on October 17, 2012, alleging disability beginning May 8, 2008. R. 74, 85, 213, 215. She later amended the alleged onset date to October 8, 2012. *See* R. 48. Her date of last insured ("DLI") is December 31, 2012. R. 74, 247. Therefore, the most relevant time period for her application and the Court's review commenced October 8, 2012, and expired December 31, 2012. Nevertheless, the relevant period also includes medical records from outside that three-month period to the extent they are material to Plaintiff's impairments and limitations during the end of 2012.

The Commissioner denied the application initially and on reconsideration. R. 72-73, 136-37. On April 7, 2014, Administrative Law Judge ("ALJ") Carol Bowen held a hearing on Plaintiff's claims. *See* R. 47-71. On July 25, 2014, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing work that exists in significant numbers in the national economy. R. 29-38. Applying the sequential, five-step analysis set out in the regulations (20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)) the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. R. 31. The ALJ next determined that Plaintiff had the following severe impairments: "type II diabetes mellitus with polyneuropathies; lumbar degenerative disc disease; lumbar stenosis/cervicalgia; cervical spondylosis/myelopathy; obesity; interstitial lung disease; major depressive disorder; and panic disorder with agoraphobia." *Id.*

Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[3]  R. 32-33.

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC")[4] to (1) lift/carry ten pounds frequently and twenty pounds occasionally; (2) stand/walk for six hours in an eight-hour workday; (3) sit for six hours; (3) balance, stoop, kneel, and crouch occasionally, but no climbing or crawling; (4) handle, finger, and feel bilaterally frequently.  R. 33.  Plaintiff also had several environmental restrictions – she must avoid work at unprotected heights or with hazardous machinery and avoid concentrated exposure to chemicals and other irritants add to extremes of heat, cold, dampness, or humidity.  *Id.*  Given her severe mental impairments, she could understand, remember, and carry out detailed, but not complex, tasks in a routine work setting and was limited to only occasional interaction with others.  *Id.*

Based upon the RFC determination and testimony from a vocational expert ("VE") about the exertional demands and skill requirements of Plaintiff's prior jobs, the ALJ concluded that Plaintiff could not perform her past relevant work, but could perform jobs that exist in significant numbers in the national economy.  R. 36-37.  The VE identified multiple light and sedentary jobs that would be available for a hypothetical person with an RFC consistent with that assessed for Plaintiff.  *See* R. 37.  At Step 5 of the evaluative sequence, the ALJ thus found that Plaintiff was not disabled within the meaning of the Social Security Act between October 8, 2012, and the date of the ALJ's decision.  *Id.*

---

[3]Sections 404.1525 and 416.925 explain the purpose and use of the listings of impairments.

[4]Sections 404.1545(a)(1) and 416.945(a)(1) explain that a claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). However, that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

The Appeals Council received and considered additional evidence (Exs. 13E, 40F, and 41F) when it denied review on October 15, 2015. *See* R. 1-4. The ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on November 20, 2015. *See* Compl. She presents three issues for review, including whether the ALJ properly considered all relevant opinions when determining her mental and physical RFC and whether the ALJ included all vocationally significant limitations when determining her mental RFC. *See* Pl.'s Appeal at 1-2, 10-16.

## II.   MEDICAL RECORD

A summary of the relevant medical record is helpful before setting out the legal standards and analyzing the issues. Plaintiff asserts error in the consideration given to opinions of her treating physician, Mark A. Rodgers, M.D., of Arlington Family Health Pavilion, P.A. ("Arlington Family"); Kayleigh King, RN, of that same clinic; treating psychiatrist, Cathal P. Grant, M.D.; and a licensed clinical social worker, Gay Kelso of Logos Counseling.[5]

### A. Physical Health

Dr. Rodgers has treated Plaintiff since at least 2006. *See* R. 1013. Prior to her amended alleged onset of disability, Plaintiff had an MRI of her cervical spine in May 2008. R. 556. The scan reveals (1) "a 2 mm soft tissue disc bulge" at C2-3; (2) a "3 mm soft tissue disc bulge/protrusion"

---

[5]Plaintiff added the opinions of Social Worker Kelso after the Commissioner pointed out that the ALJ had discounted her proposed limitations in mental function, not limitations proposed by Dr. Grant. Even though Plaintiff had initially referred to Dr. Grant, it is clear from the administrative record that the limitations were actually proposed by the social worker.

at C3-4; (3) a 4-5 mm disc protrusion at C4-5 touching and slightly effacing the cervical cord; (4) "an approximately 2 mm broad-based annular bulge" at C5-6, C6-7, C7-T1, and T1-2; and (5) "an approximately 2-3 mm soft tissue disc bulge/protrusion" at T5-6. R. 556.

On October 3, 2012, Plaintiff visited Arlington Family for skin discoloration and continuing neck and back pain. R. 904. Dr. Rodgers noted numerous medical issues for Plaintiff, including backache, diabetes, generalized pain, malaise, and fatigue. R. 904-06. Plaintiff reported pain in her muscles, neck, and back in addition to weakness and numbness in her arms and hands. R. 905. Physical examination revealed slightly reduced grip strength, decreased sensation in the hands laterally, and an absence of deep tendon reflexes in her arms bilaterally. *Id.* Dr. Rodgers diagnosed a disc disorder, abdominal pain, backache, and diabetes. *Id.* He found that Plaintiff "has evidence of nerve compression" in the cervical spine with weakness of the hands bilaterally, especially her dominant right hand. R. 906. Given Plaintiff's herniated disc at C4-5, other minor protrusions revealed by the May 2008 MRI, and "worsening neurological symptoms," Dr. Rodgers ordered another MRI. *Id.*

Plaintiff underwent another MRI on October 8, 2012. R. 569. The scan reveals that (1) the bulge at C2-3 had increased to 3 mm; (2) the protrusion at C3-4 had increased to 3-4 mm and was "touching and effacing the cervical cord"; (3) the protrusion at C4-5 had not changed; (4) the bulge at C5-6 had increased to 3 mm "barely touching but not effacing the cervical cord"; and (5) the bulge at C6-7 and C7-T1 had increased to 2-3 mm. R. 569-70. In short, the 2012 scan shows "increasing multilevel disk bulge/protrusion." R. 570.

On December 18, 2012, Plaintiff's pain resulted in x-rays of her chest and right hand. R. 584-85. The chest scan shows "scattered fibronodular densities and chronic linear fibrotic change

in both lungs" and the other scan shows mild osteopenia in her right hand. R. 584-85. A December 26, 2012 follow-up chest x-ray shows little change. R. 590. The next day, Plaintiff visited Arlington Family for follow-up on her pneumonia. R. 630. Nurse King recorded diagnoses of pneumonia and limb pain. R. 631. Plaintiff received two injections and Nurse King discussed the follow-up x-ray with Plaintiff and Dr. Rodgers. *Id.*

Sudhakar Rumalla, M.D., examined Plaintiff on January 2, 2013, at the Commissioner's request. R. 596-600. Plaintiff complained of neck and low-back pain, pain radiating to both hands, tingling in all extremities, and right-hand weakness. R. 596. She stated that "[o]n a good day she may be able to write . . . walk for 15 minutes, stand maybe 10 to 15 minutes, sit 30 minutes and carry maybe 10 pounds holding in both hands for about 75 feet." *Id.* Dr. Rumalla noted that Plaintiff was "very obese" and was "in no severe pain or respiratory distress." R. 597.

Examination of Plaintiff's lower extremities showed straight leg raising possible to about 10 degrees on the right side and 20 degrees on the left, with low back pain. R. 598. Examination of the upper extremities showed moderate to severe tenderness of the metacarpophalangeal ("MCP") joints of the fingers of the right hand, with mildly weak grip, and moderate tenderness of the MCP joints of the second and third fingers of the left hand, with good grip. *Id.* Plaintiff was "able to raise both hands straight over the head without difficulty." R. 599. Dr. Rumalla found moderate tenderness in the cervical and lumbar areas of Plaintiff's spine and mildly limited passive range of motion in all planes of the cervical area with discomfort. *Id.* Neurologically, Plaintiff had impaired pinprick sensation in "right upper extremity C5 to T1 distribution and right lower extremity L1 to S1 distribution." *Id.* She also had mildly weak right hand grip and deep tendon reflexes were absent in all extremities. *Id.* She could walk in a straight line without limp or reeling, but could not tandem walk

or walk on her heels or toes. *Id.* She was "able to squat partially and raise while holding onto the table." *Id.*

Within his impressions, Dr. Rumalla included impairments of the cervical and lumbar areas of the spine (chronic cervicalgia and lumbosacral syndrome, cervical and lumbar spondylosis; degenerative disc disease; spinal stenosis, facet arthropathy); possible bilateral cervical radiculopathy; diabetes; probable diabetic peripheral polyneuropathy; and extreme obesity. R. 600. A January 2, 2013 scan of Plaintiff's cervical spine indicates spinal stenosis and shows multilevel degenerative disc disease. R. 601.

Plaintiff visited Arlington Family on January 10, 2013, for follow-up regarding pneumonia. R. 627. Plaintiff reported chronic back pain, fatigue, and chest congestion. R. 628. Plaintiff had normal gait, station, and stability. *Id.* Nurse King recorded four diagnoses: (1) pneumonia, (2) other chronic pain, (3) long-term use of medications; and (4) diabetes. *Id.*

On January 14, 2013, an evaluating orthopedist, Anthony B. Brentlinger, M.D., found that Plaintiff had locking of the right hand when she made a fist. R. 606. Plaintiff also had a normal stance and gait. *Id.* Dr. Brentlinger noted his impression as stenosing flexor tenosynovitis of the right index finger. R. 606-07.

Agency consultant, Amita Hegde, M.D., assessed Plaintiff's limitations from April 2012 to January 14, 2013. R. 79-82. She opined that Plaintiff was limited to lifting twenty pounds occasionally and ten pounds frequently. R. 80. She further opined that Plaintiff could stand or walk with normal breaks for about six hours; sit for a like period; and could frequently balance, stoop, kneel, crouch, and climb ramps or stairs, but could only occasionally crawl or climb ladders, ropes, and scaffolds. *Id.* She also opined that Plaintiff's handling and feeling was limited to frequently in her

right hand due to mild grip weakness and sensation. R. 81.

When denying Plaintiff's disability claim on January 24, 2013, the Commissioner stated diagnoses of degenerative disc disease and other unspecified arthropathies. R. 73. The Commissioner also noted three medically determinable severe impairments: (1) disorders of back, (2) other and unspecified arthropathies, and (3) diabetes. R. 78.

Plaintiff visited Arlington Family on February 5, 2013, because she needed a wheelchair and references to neurologist and psychiatrist. R. 625. She reported "increased anxiety and recurrent back pain." *Id.* She also reported "[d]ifficulty rising from sitting position." R. 626. Nurse King noted numerous health issues, including bronchitis, backache, diabetes, generalized and chronic pain, pneumonia, shortness of breath, and spinal stenosis. R. 625-26. Physical examination revealed a normal gait, station, and stability. R. 626. Nurse King noted two diagnoses: lumbago (Code 724.2) and spinal stenosis (Code 724.00). *Id.* At that point, the stated plan was medication and referrals for neurology, psychology, and physical therapy. *Id.*

Upon referral from Dr. Rodgers, Kevin Conner, M.D., evaluated Plaintiff for spinal stenosis on February 21, 2013. R. 742. Plaintiff reported neck and low-back pain. *Id.* He found that she had "bilateral carpal tunnel" and "finger trigger," but could not "afford physical therapy." *Id.* She was "very deconditioned," had normal cortical functions, and her gait and station were "within normal limits." *Id.* His primary assessments were cervical spondylosis and diabetes, but surgical intervention was not required. R. 743. He declined to prescribe a wheelchair because she was out of shape and "would benefit from a regular exercise program and weight reduction." *Id.*

On March 13, 2013, Plaintiff visited Arlington Family to discuss her diabetes and to complete paper work. R. 864. She reported fatigue, but denied chest, abdominal, joint, and muscle pain.

8

R. 865. Physical examination showed her to be obese and Nurse King noted diagnoses of diabetes, lumbago, acute respiratory infections, and other malaise and fatigue. *Id.* In a Physician's Statement of the same date, Nurse King recorded that Plaintiff was unable to work due to a permanent disability. R. 855. She opined that Plaintiff could sit for no more than four hours; stand for no more than two hours; walk for no more than two hours; and keyboard for no more than two hours. *Id.* In addition, Plaintiff was limited to lifting no more than ten pounds and could not climb, kneel, squat, bend, stoop, push, or pull. *Id.*

On March 25, 2013, Plaintiff visited Arlington Family because she thought she may be getting pneumonia again. R. 866. She reported shortness of breath, cough, and fatigue. R. 866-67. Nurse King noted a normal gait, station, and stability. R. 867. She also noted diagnoses of cough and shortness of breath. R. 868. Chest x-rays were ordered. *Id.*

On April 11, 2013, agency consultant, Betty Santiago, M.D., assessed Plaintiff's limitations from April 2012 through April 2013. R. 96-98. Her assessment did not differ from the assessment of Dr. Hegde. *Compare id. with* R. 79-82. Nevertheless, when the Commissioner considered Plaintiff's disability claim on reconsideration, the Commissioner recognized only one severe physical impairment – a back disorder. R. 93.

A Radiology Report dated May 2, 2013, indicates that Plaintiff suffered from "shortness of breath, abnormal chest radiograph, [and] interstitial lung disease." R. 1182. At a May 13, 2013 physical examination by Dr. Rodgers, Plaintiff reported fatigue, sleep problems, headaches, muscle weakness, and environmental allergies. R. 1166.

Dr. Rodgers examined Plaintiff on June 20, 2013. R. 1162-63. At that time, she presented numerous problems. R. 1162. She complained of breathing difficulty; limited joint mobility; pain

in her joints, muscles, neck, back; and "lots of pain in hands." R. 1163. She had a normal gait, station, and stability. *Id.* Among other things, Dr. Rodgers diagnosed joint pain, backache, and uncontrolled diabetes mellitus. *Id.* He prescribed a wheelchair based on diagnoses of unspecified neuropathies (Code 357.9), spinal stenosis (Code 724.00), and shortness of breath (Code 786.05) and stated: "[Patient] is ill [and] has clear medical problem that will not allow her to seek gainful employment." R. 1253.

That same day, Dr. Rodgers completed a Physical Residual Functional Capacity Question-naire. R. 1250-52. He opined that, in an eight-hour workday, Plaintiff could sit for four hours, stand/walk for one hour, and need to lie down or recline for three hours. R. 1250. He further opined that she could only sit or stand for fifteen minutes before needing to change positions and would need the flexibility to continuously change positions. *Id.* He identified pain, leg weakness, fatigue, and shortness of breath as reasons for the postural limitations. *Id.* He limited Plaintiff to frequent lifting/carrying up to ten pounds and found that pain and arm weakness resulting from her impair-ments precluded lifting or carrying any weight above ten pounds. R. 1251. Hand weakness and arth-ritis limited Plaintiff's ability to perform repetitive actions involving simple grasping, pushing and pulling, and fine manipulation. *Id.*

Dr. Rodgers identified the following objective signs of pain: (1) joint deformity, (2) x-ray, (3) muscle spasm, (4) nerve/muscle findings, (5) arthritic changes, and (6) disc abnormality. *See id.* He rated her pain as severe, which means that the pain would preclude the activity that precipitated the pain. *Id.* He opined that her pain would frequently interfere with her attention and concentration and that Plaintiff would frequently need rest periods during the day. R. 1252. He further opined that Plaintiff's pain and symptoms would cause her to miss work four or more days a month. *Id.* Finally,

he stated that Plaintiff's limitations began to be disabling in May 2008. *Id.*

Plaintiff had a scan of her abdomen and pelvis on December 27, 2013. R. 1219-20. She reported having pain on her right side radiating to her back for two months. R. 1221. The scan reveals "[m]oderate degenerative changes . . . within the lower lumbar spine . . . a bulging or protruding disc with spinal canal narrowing at L3-4 and par defects at L5-S1 with anterolisthesis of L5 on S1." R. 1219.

Plaintiff visited Arlington Family on August 14, 2014, for a vascular referral and to complete paperwork for food stamps. R. 1301. Plaintiff reported pain in her joints, muscles, and back; weakness and numbness in her right leg; a balance problem; and difficulty walking, reaching above head, and rising from sitting position without assistance. R. 1302. Examination by a Nurse Practitioner revealed back pain radiating to right leg and foot and numbness and tingling in right foot. *Id.*

At the request of Dr. Rodgers, Plaintiff had an MRI of her lumbar spine and x-rays of her tailbone and lumbar spine on September 2, 2014. R. 1275-76, 1292-93. The MRI reveals "anterolisthesis of L5 on S1 most likely due to degenerative spondylolisthesis." R. 1275. It further reveals a 2-3 mm disc protrusion at T12-L1; a 3-4 mm disc extrusion at L2-3; and a 4 mm disc extrusion at L3-4, with narrowing of the spinal canal; and a 3 mm disc protrusion at L5-S1 with "[m]inimal contact and effacement of the thecal sac at the level of the proximal S1 nerve root sleeves." R. 1275-76. The tailbone x-ray reveals "underlying osteopenia," but "no definite evidence for fractures or dislocations." R. 1292. The lumbar spine x-ray also reveals osteopenia with a loss of disc space height and a "grade 1 anterolisthesis of L5 relative to S1." R. 1293.

On referral from Dr. Rodgers, Frederick D. Todd, II, M.D., conducted a neurological surgery consultation on September 17, 2014, and evaluated Plaintiff's complaints of low back pain radiating

11

into her lower extremities since May 2014. R. 1270-72. Plaintiff reported that worsening pain with walking and standing, whereas sitting would alleviate the pain somewhat. R. 1270. Plaintiff was "able to heal and toe walk," grab her knees without radiating pain, and perform straight leg raising ninety degrees. R. 1271. She had intact sensation and no weakness in the lower extremities. *Id.* Dr. Todd reviewed the September 2, 2014 lumbar MRI scan and found it consistent with spondylolisthesis. *Id.* After discussing various options with Dr. Todd, Plaintiff elected to pursue surgery because past pain management had not worked. *Id.*

On October 20, 2014, Plaintiff visited Dr. Rodgers for back pain. R. 1285. He noted her numerous physical problems and active medications *Id.* Plaintiff reported fatigue; joint, muscle, neck, and back pain; stiffness; tenderness; and difficulty with walking. R. 1286. Dr. Rodgers noted that Plaintiff was having increased tingling in arms and hands and increased neck and mid-back pain. *Id.* He further noted that Plaintiff was planning to have spine surgery and that a neurosurgeon had recommended a discetomy and fusion of discs but Plaintiff wanted "to try something less invasive." *Id.* Physical examination revealed spine tenderness, decreased strength in both hands, and decreased reflexes in arms and legs. *Id.* He diagnosed diabetes and an associated neurological disorder in addition to various disc disorders. R. 1286-87. He planned MRIs of the cervical and thoracic areas of the spine. R. 1287.

A cervical spine MRI of October 25, 2014, reveals a 2 mm disc bulge/protrusion at C2-3; 2-3 mm disc bulges/protrusions at C4-5 and C5-6; and a 1-2 mm bulge at C6-7 and C7-T1. R. 1279-80. The resulting impression was multilevel disc desiccation and disc displacement. R. 1280. An MRI of the thoracic spine of the same date reveals a normal thoracic cord and contents, well-maintained vertebral height, and diffuse disc desiccation with moderate loss of disc space height from T3-4 to

T10-11 levels. R. 1281. There were also various bulges/protrusions, including a 4-5 mm protrusion

or herniation that effaced the thoracic cord and narrowed the left foramen. *Id.* The thoracic MRI

resulted in the same impression as the cervical spine MRI. *Compare* R. 1280 *with* R. 1281.

## B. Mental Health

With the initial denial of Plaintiff's disability claim on January 24, 2013, the Commissioner

noted that no mental impairment appeared relevant to the claim. R. 77. However, when Dr. Grant

examined Plaintiff on February 19, 2013, on referral from Dr. Rodgers, Plaintiff complained of panic

attacks and depression. R. 756. Dr. Grant noted that Plaintiff had experienced anxiety symptoms

since 1999 and depression since her teens. *Id.* Dr. Grant diagnosed a major depressive disorder

without psychotic features (Code 296.33) and a GAF score of 45.[6] R. 759.

When Plaintiff first visited LCSW Kelso on February 28, 2013, the counselor noted the same

diagnosis as Dr. Grant – Code 296.33. R. 1186. Plaintiff related a history of various stressors and

circumstances leading to her mental impairment. *See id.*

On March 5, 2013, Dr. Grant added a new diagnosis (Code 300.01)[7] and prescribed medica-

tion (Cymbalta). R. 752. Later that month, Plaintiff complained of anxiety, depression, nervousness,

---

[6]"GAF" is an acronym for "Global Assessment of Functioning," which was a standard measurement of a "clinician's judgment" of an "individual's overall level of 'functioning on a hypothetical continuum of mental health-illness.'" American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders [hereinafter DSM-5] 16 (5th ed. 2013) (quoting DSM-IV). DSM-5 dropped GAF as a relevant measurement "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Id.* In DSM-IV, a "GAF score of 41 to 50 reflect[ed] serious symptoms or any serious impairment in social, occupational, or school functioning." *Lee v. Astrue*, No. 3:10-CV-0155-BH, 2010 WL 3001904, at *8 n.4 (N.D. Tex. July 31, 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994)).

[7]The ALJ apparently interpreted the code as reflecting a panic disorder with agoraphobia, *see* R. 31, and Plaintiff contends that Code 300.01 reflects such diagnosis, Pl.'s Appeal at 8. But since at least 2000, Code 300.01 has indicated a panic order without agoraphobia. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 440 (4th ed. text revision 2000) [hereinafter DSM-IV-TR]. Similarly, Code 300.01 as set out in DSM-5 indicates a panic disorder without agoraphobia and includes a separate code for agoraphobia. *See* DSM-5 at 208, 217-18.

sadness, and stress to her primary care provider, Dr. Rodgers.  R. 870.  In April 2013, Plaintiff's

GAF had increased to 55,[8] but she also reported increased anxiety and panic.  R. 748.  Despite her

evaluations and diagnoses, Dr. Grant made no opinion as to how the mental impairments would limit

Plaintiff's ability to perform work activities.

   Plaintiff attended a second session with LCSW Kelso on April 9, 2013.  R. 1185.  Consistent

with the diagnosis of Dr. Grant, the counselor added Code 300.01 as another diagnosis.  *Id.*  She also

noted "paranoid traits."  *Id.*  Plaintiff reported increased home stress and arguments.  *Id.*  The coun-

selor set a plan to increase medication and exercise.  *Id.*

   On April 11, 2013, an agency consultant, Janice Ritch, Ph.D., viewed the medical record and

found that Plaintiff had a non-severe affective disorder.  R. 93-95.  She found that Plaintiff had no

restrictions of activities of daily living or episodes of decompensation and only mild difficulties in

maintaining, social functioning, concentration, persistence, or pace.  R. 94.  In summarizing Plain-

tiff's psychiatric record, she stated the March 5, 2013 diagnosis as "Panic disorder without agora-

phobia."[9]  R. 93.  The next month, Plaintiff reported anxiety, nervousness, depression, sadness, and

stress to her primary care physician.  R. 1166.

   LCSW Kelso completed a Mental Residual Functional Capacity Assessment for Plaintiff on

February 20, 2014.  R. 1260-62.  The counselor rated sixteen of twenty work-related abilities as poor

– meaning that Plaintiff's abilities to function in those areas were "almost absent" – and rated the

other abilities as fair – meaning that Plaintiff's abilities in those areas were "seriously limited but

---

[8]In DSM-IV-TR, a "GAF rating of fifty-one to sixty indicate[d] a 'moderate' impairment in social, occupational, or school functioning."  *Carr v. Astrue*, No. 3:10-CV-1474-BH, 2011 WL 1533481, at *3 n.3 (N.D. Tex. Apr. 21, 2011) (citing DSM-IV-TR).

[9]This interpretation is consistent with DSM-5 and DSM-IV-TR coding.

14

not precluded." *See id.* Among other things, Plaintiff had a fair "ability to understand and remember very short and simple instructions" as well as remembering "locations and work like procedures," but had a poor ability with respect to "detailed instructions." R. 1260. Plaintiff's had poor abilities in all eight abilities listed for sustained concentration and persistence, including carrying out both simple and detailed instructions and maintaining regular attendance within customary tolerances. R. 1260-61. Plaintiff had poor social interaction abilities in four of five listed abilities, but was rated as fair in the "ability to ask simple questions or request assistance." R. 1261. Similarly, Plaintiff had poor adapting abilities in three of four areas, but was rated fair in her "ability to be aware of normal hazards and take appropriate precautions." R. 1261-62.

LCSW Kelso recorded that the noted limitations were in effect prior to December 31, 2012. R. 1262. Additionally, she noted that Plaintiff was "very depressed," had "difficulty walking [and] remaining steady," and she lacked funds for medication. *Id.* In a "Session Summary Report" of the same date, the counselor noted that Plaintiff had severe issues contributing to her mental impairment (Code 296.33) and she "needs treatment quickly." R. 1263.

Four days later, Dr. Grant evaluated Plaintiff for medication management and depression. R. 1265. She noted that she had last seen Plaintiff on April 8, 2013. *Id.* Plaintiff had financial difficulties and was off her medication. *Id.* She was living in her car. *Id.* She looked "sickly." *Id.* Psychiatric examination revealed a guarded attitude; delayed speech; depressed, sullen, irritable mood with panic attacks; impaired attention and concentration; and average intelligence. R. 1265-67. Her mood scale was one out of ten, with ten being the best. R. 1267. Dr. Grant found decreased mood and physical health and increased anxiety. R. 1268. She stated the same diagnoses as before – Codes 296.33 and 300.01 – and prescribed Cymbalta. *Id.*

15

## III.   LEGAL STANDARD

In general,[10] a person is disabled within the meaning of the Social Security Act, when he or

she is unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).   "'Substantial gainful activity' is work activity involving significant

physical or mental abilities for pay or profit."   *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th

Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)); *accord* 20 C.F.R. § 416.972(a)-(b).   To evaluate a

disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently work-
> ing; (2) the claimant has a severe impairment; (3) the impairment meets or equals an
> impairment listed in appendix 1 of the social security regulations; (4) the impairment
> prevents the claimant from doing past relevant work; and (5) the impairment prevents
> the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines

that the claimant is or is "not disabled, the inquiry is terminated."   *Id.* at 448.   The Commissioner

must assess the claimant's RFC before proceeding to Steps 4 and 5.   *Perez v. Barnhart*, 415 F.3d

457, 461 (5th Cir. 2005).   For Steps 1 through 4, the claimant has the burden to show disability, but

the Commissioner has the burden at Step 5 to "show that there is other substantial work in the

national economy that the claimant can perform."   *Audler*, 501 F.3d at 448.   If the Commissioner

carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or

she can perform other work that is available in the national economy.   *Newton v. Apfel*, 209 F.3d

---

[10]The Act provides an alternate definition of disability for individuals under the age of eighteen, *see* 42 U.S.C. § 1382c(a)(3)(C), and blind individuals who are fifty-five years of age or older, *see* 42 U.S.C. § 423(d)(1)(B).   These provisions are inapplicable on the current facts.

448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016) (quoting *Newton*, 209 F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461. The courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

## IV.   ANALYSIS

This appeal raises the following issues: (1) whether the ALJ included all of Plaintiff's vocationally significant limitations when determining her mental RFC; (2) whether the ALJ properly considered all relevant opinions when determining her RFC; and (3) whether the Appeals Council properly considered the new evidence submitted to it. *See* Pl.'s Appeal at 1-2, 10-16. Because the first two issues are interrelated and the second issue concerns Plaintiff's physical and mental RFC, the undersigned addresses those issues together.

### A.  RFC Determination and Weight Given to Medical Evidence

Plaintiff contends that the ALJ failed to give proper consideration to opinions of various

17

medical sources when determining her RFC.

When considering whether a claimant is disabled, the Commissioner considers all relevant evidence available, including medical opinions.[11] *See* 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions may come from treating sources (for example primary care physicians), non-treating sources (physicians who perform a single examination of the claimant), or non-examining sources (a physician who reviews only the claimant's medical record). *See generally id.* §§ 404.1502, 416.902.

The regulations, furthermore, distinguish between "acceptable medical sources," such as licensed physicians, optometrists, and podiatrists; licensed or certified psychologists; and qualified speech-language pathologists, and "other sources," including other medical sources (nurse practitioners, physician assistants, chiropractors) that do not qualify as an acceptable medical source under the regulations. *See generally id.* §§ 404.1513. 416.913. Therapists and licensed clinical social workers are considered as other medical sources within the meaning of the regulations. *See* Titles II & XVI: Considering Ops. & Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by other Governmental and Nongovernmental Agencies, SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). The distinction between acceptable and non-acceptable medical sources is necessary because (1) sections 404.1513 and 416.913 require evidence from an acceptable medical source to establish the existence of a medically determinable impairment, (2) sections 404.1527(a)(2) and 416.927(a)(2) provide that only

---

[11]As explained to claimants: "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). These regulations, however, reserve some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulation. *Id.* §§ 404.1527(d), 416.927(d).

acceptable medical sources can render a medical opinion within the meaning of the regulations; and (3) only acceptable medical sources qualify as a "treating source," as defined in sections 404.1502 and 416.902, whose medical opinions may warrant controlling weight under sections 404.1527(c)(2) and 416.927(c)(2). *See id.*

While evidence from an acceptable medical source is essential to a disability claim, the Commissioner "may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d). Given the requirement that ALJs must "consider all relevant evidence" when making a disability determination, they must consider "opinions from medical sources who are not 'acceptable medical sources.'" SSR 06-03p, 2006 WL 2329939, at *6; *accord* 20 C.F.R. §§ 404.1520b, 416.920b (both stating "[a]fter we review all of the evidence relevant to your claim, including medical opinions . . . we make findings about what the evidence shows"). "Although [sections] 404.1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from other sources, they do require consideration of such evidence when evaluating an acceptable medical source's opinion." SSR 06-03p, 2006 WL 2329939, at *4 (omitting internal quotation marks). Nevertheless, what ALJs must consider differs from what they must explain as stated in SSR 06-03p:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

*Id.* at *6.

Because "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case," the facts of each case impact the evaluation of opinions from medical sources who do not qualify as acceptable medical sources. *Id.* at *5. Thus, while ALJs must consider all relevant evidence, their approach and resulting explanations may differ depending on the type of evidence presented. To facilitate review of their decisions, ALJs should identify the relevant opinions of all medical sources and explain the weight given to such opinions or otherwise provide sufficient discussion of the evidence in their decisions to permit the claimant and any subsequent reviewer to follow their reasoning. When identifying and considering relevant opinions, ALJs "must remember" that some medical records, such as medical source statements provided by a treating source, "may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one." Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996).

Considering relevant medical opinions from a treating source also entails determining "whether any such opinion is entitled to controlling weight." *Bentley v. Colvin*, No. 13-CV-4238-P, 2015 WL 5836029, at *7 (N.D. Tex. Sept. 30, 2015) (citing appropriate regulations). "When a treating source has given an opinion on the nature and severity of a patient's impairment, such opinion is entitled to controlling weight if it is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with' other substantial evidence." *Wilder v. Colvin*, No. 13-CV-3014-P, 2014 WL 2931884, at *3 (N.D. Tex. June 30, 2014) (quoting *Newton*

20

*v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)); *accord* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

For treating source medical opinions, the regulations provide a six-factor detailed analysis to follow unless the ALJ gives such opinions controlling weight. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).[12] To properly assess the weight to give such opinions, ALJs who find a treating source opinion not entitled to controlling weight must consider the regulatory six factors. *Newton*, 209 F.3d at 456. In addition, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [the regulations]." *Id.* at 453. Further, while those regulatory sections "explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources'" because the "factors represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources.'" SSR 06-03p, 2006 WL 2329939, at *4.

Nevertheless, "*Newton* requires only that the ALJ 'consider' each of the [regulatory] factors and articulate good reasons for its decision to accept or reject the treating physician's opinion. The [ALJ] need not *recite* each factor as a litany in every case." *Jeffcoat v. Astrue*, No. 4:08-CV-672-A, 2010 WL 1685825, at *3 (N.D. Tex. April 23, 2010) (emphasis added). *Newton*, furthermore, does not require the detailed analysis when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." 209 F.3d at

---

[12]These factors are: (1) the examining relationship; (2) the treatment relationship, including the length of time the physician has treated the claimant, the frequency of examination by the physician, and the nature and extent of the treatment relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any others factors brought to the ALJ's attention. 20 C.F.R. §§ 404.1527(c), 416.927(c).

458. Likewise, the detailed analysis under *Newton* is not necessary when the ALJ has weighed the treating physician's opinion against opinions of other treating or examining physicians who "have specific medical bases for a contrary opinion." *Id.*

In addition, under the applicable regulations (20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1)), "the ALJ may re-contact a treating physician or other medical source if there is insufficient evidence to determine whether the claimant is disabled." *Perry v. Colvin*, No. 3:13-CV-2252-P, 2015 WL 5458925, at *7 (N.D. Tex. Sept. 17, 2015); *accord Jones v. Colvin*, No. 4:13-CV-818-A, 2015 WL 631670, at *7 (N.D. Tex. Feb. 13, 2015) (accepting recommendation of Mag. J. which recognized that, effective March 26, 2012, this new regulation replaced the former mandatory requirement of § 404.1512(e) applied in *Newton*).[13] Further, "if after weighing the evidence [the ALJ] cannot reach a conclusion about whether [the claimant is] disabled," the regulations provide "various options, including re-contacting a treating physician or other medical source, to resolve an inconsistency or insufficiency of evidence." *Bentley*, 2015 WL 5836029, at *8.

The ALJ, as fact-finder, "has the sole responsibility for weighing evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). ALJs have considerable discretion in assigning weight to medical opinions and may reject the opinion of a physician when the evidence supports a contrary conclusion. *Newton*, 209 F.3d at 455-56. Additionally, for good cause shown, an ALJ may assign little or no weight to an opinion from a treating source. *Id.* "Good cause may permit an ALJ to discount the weight of

---

[13]These regulations were in effect when the ALJ issued her decision on July 25, 2014. Prior to the effective date of sections 404.1520b and 416.920b, the ALJ would have been obliged under the mandatory provisions of sections 404.1512(e) and 416.912(e) to "seek clarification or additional evidence from the treating physician" if the ALJ determined "that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant." *See Newton*, 209 F.3d at 453.

a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456.

In this case, there is no significant dispute as to the impairments of Plaintiff.[14] The dispute arises from what effect those impairments had on her functional ability to engage in any substantial gainful activity. Most pertinent to this appeal, the ALJ determined that Plaintiff retained the physical RFC to stand/walk for six hours in an eight-hour workday; sit for six hours; and handle, finger, and feel bilaterally frequently. R. 33. With respect to Plaintiff's mental RFC, the ALJ determined that she could understand, remember, and carry out detailed, but not complex, tasks in a routine work setting and was limited to occasional interaction with others. *Id.* Plaintiff contends that the RFC assessment does not adequately account for her agoraphobia and polyneuropathies and she argues that the ALJ did not properly evaluate all relevant opinions.

In March 2013, Nurse King set out her opinions regarding Plaintiff's physical ability to engage in substantial gainful activity. R. 855. She opined that Plaintiff was limited to sitting for no more than four hours and could not stand or walk for more than two hours. *Id.* In June 2013, Dr. Rodgers similarly expressed his opinions regarding Plaintiff's physical abilities, including limiting her to sitting for four hours and standing/walking for one hour and stating that she would need to lie down or recline for three hours. R. 1250. He also opined that Plaintiff would require the flexibility to continuously alternate between standing and sitting because she could only sit or stand for fifteen minutes before needing to change positions. *Id.* He further opined that Plaintiff's abilities to grasp,

---

[14]Although there may be some uncertainty as to whether the record supports a finding that Plaintiff suffers from agoraphobia, Defendant does not dispute that impairment. *See* Def.'s Resp. at 3 (listing the impairment). For purposes of this appeal, the Court should proceed as though Plaintiff suffers from a panic disorder with agoraphobia.

push, pull, and manipulate objects were limited. *Id.* Given diagnoses of unspecified neuropathies, spinal stenosis, and shortness of breath, he also prescribed a wheelchair for Plaintiff. R. 1253.

Dr. Grant has stated no opinion as to how Plaintiff's mental impairments would impact her ability to work, but LCSW Kelso set out specific limitations in February 2014 based upon Dr. Grant's diagnoses and her own personal evaluations of Plaintiff. R. 1260-62. The social worker noted that the limitations existed prior to December 31, 2012. R. 1262.

Under 20 C.F.R. §§ 404.1513(a) and 416.913(a), Dr. Rodgers and Dr. Grant qualify as acceptable medical sources, whereas Nurse King and LCSW Kelso are other medical sources under subparagraph (d). *See* SSR 06-03p, 2006 WL 2329939, at *1-2. The physicians, furthermore, are treating sources within the meaning of sections 404.1502 and 416.902 and their medical opinions may be entitled to controlling weight under the regulations. Because the nurse and social worker do not qualify as treating sources their opinions are never entitled to controlling weight, but such opinions are considered and weighed in accordance with SSR 06-03p.

Medical opinions from a treating source such as Dr. Rodgers are entitled to controlling weight if well-supported as required by the regulations and not inconsistent with other substantial evidence. The ALJ did not directly address whether his opinions are well-supported, but it appears that she found otherwise on grounds that Plaintiff had a normal gait, station, and stability. At this point, there is no need to determine whether the ALJ erred in not giving the opinions of Dr. Rodgers controlling weight because even if the Court were to find no error in that respect, such finding merely clears the first hurdle. Once the ALJ makes that finding, she must make the detailed analysis required by the regulations unless there is reliable medical evidence from a treating or examining physician controverting the claimant's treating physician. Similarly, as clarified in SSR 06-03p, the

24

ALJ must apply the general guidance those regulations provide with respect to opinions from other medical sources. This means that ALJs should (1) evaluate opinions from other medical sources through the lens of the regulatory factors set out in 20 C.F.R. §§ 404.1527(c) and 416.927(c), while remaining cognizant that not every factor will apply to every case, and (2) explain the weight given to opinions from such other sources or at least ensure that a subsequent reviewer can follow their reasoning from their discussion of the evidence. *See* SSR 06-03p, 2006 WL 2329939, at *2-6.

The ALJ considered the June 2013 medical source statement and wheelchair prescription of Dr. Rodgers, but noted that Plaintiff had "a normal gait, station, and stability" at that time. R. 35-36. Physical examination in June 2013 indeed indicated no abnormality in those areas. R. 1163. Nevertheless, the same medical record notes numerous problems, including the three diagnoses that led to the wheelchair prescription, and Plaintiff's complaints of breathing difficulty; limited joint mobility; pain in her joints, muscles, neck, back, and "lots of pain in hands." R. 1162-63.

Although the ALJ mentioned the June 2013 medical source statement, she neither discussed the medical opinions stated therein nor indicated what weight, if any, she accorded the opinions. *See* R. 35-36. She apparently simply rejected the medical source statement on grounds that Plaintiff had a normal gait, station, and stability. *See id.* She identified no contrary opinion by any physician, although she previously discussed medical records of Dr. Rumalla when rejecting Plaintiff's statements regarding her physical abilities. *See* R. 34-35.

The ALJ also considered the March 2013 medical source statement signed by Nurse King, but neither discussed any opinion stated therein nor indicated what weight was given to the opinions. *See* R. 35. The ALJ discounted the statement on grounds that Arlington Family merely treated Plaintiff for diabetes, not degenerative disc disease – the primary diagnosis for the nurse's March 2013

opinions. *Id.* The ALJ also mentioned that, on the date of the statement, Plaintiff denied joint and muscle pain and demonstrated no complications from her diabetes. *Id.*

In addition, the ALJ considered opinions of the social worker but did not indicate what weight, if any, she gave them. R. 36. Nevertheless, she discounted them because "there is no indication that a mental health status evaluation was performed," and although Plaintiff was "experiencing significant life stress at the time of this evaluation . . . [her] depressive symptoms stabilized for many months with medication." *Id.* The ALJ also found that the evidence shows that Plaintiff "received mental health care for only a few months during 2013, and then did not report or exhibit mental health symptoms for many months." *Id.* The ALJ thus concluded that the facts of this case and the stabilized symptoms "do not establish symptoms that would be expected to persist for the twelve consecutive months required of a disability." *Id.*

The Commissioner argues that the ALJ relied on highly qualified state agency medical consultants (Drs. Hegde and Santiago) but found additional limitations based upon evidence not before them and on the ALJ's interpretation of the evidence that was before them. Def.'s Resp. at 8. The ALJ, however, states no reliance on any opinion of the agency consultants – she merely states that her "decision is based on updated evidence that was not available for review by the State Agency, and a different interpretation of the evidence reviewed by the State Agency physician." R. 36. In any event, neither state agency consultant qualifies as a treating or examining physician. Thus, their opinions provide no basis to bypass the detailed analysis required by *Newton* and the regulations.

Dr. Rumalla is the only consultative examining physician. The Commissioner argues that his records are inconsistent with opinions of Dr. Rodgers. Def.'s Resp. at 11-12. Although the ALJ considered the records of Dr. Rumalla, she did not compare them to any opinion of Dr. Rodgers.

*See* R. 34-36. At most, the ALJ found the records inconsistent with Plaintiff's statements to Dr. Rumalla that, on a good day, she "may be able" to write; walk for fifteen minutes; stand ten to fifteen minutes; sit thirty minutes; and carry ten pounds seventy-five feet using both hands. *See* R. 34. However, that the records do not support those statements of Plaintiff does not mean that they are also inconsistent with specific opinions of Dr. Rodgers. For instance, Dr. Rodgers opined that Plaintiff's physical impairments require her to lie down or recline for three hours each workday, limit her ability to sit to four hours and stand/walk to one hour, and require flexibility in switching between standing and sitting. Dr. Rumalla states no opinion that controverts those opinions of Dr. Rodgers and his medical records likewise do not appear to controvert those opinions or the opinions of Nurse King. The records of Dr. Rumalla provide no basis to bypass the detailed analysis required by the regulations. Dr. Rumalla, furthermore, did not address any mental impairment of Plaintiff.

For the reasons stated, the applicable regulations required the ALJ to analyze the opinions of Dr. Rodgers in the detailed manner addressed in *Newton*. Similarly, the ALJ had to comply with SSR 06-03p with respect to opinions of the nurse and social worker. In this case, the ALJ did not recite the six factors, although she does note in conclusory fashion that she had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927" and various social security rulings, including SSR 06-03p. *See* R. 33. Such a general, conclusory statement is not an adequate substitute for consideration of the six factors.

The ALJ decision in this case reflects little consideration of the factors. She recognized Nurse King as a non-acceptable medical source, but only recognized Dr. Rodgers as a physician and Kelso as a licensed clinical social worker without further discussion. R. 35-36. Further, although the ALJ noted that Dr. Rodgers and Nurse King examined Plaintiff, she states that there is no indica-

tion that a mental status evaluation was performed when Kelso rendered her opinion. *Id.* That nota-

tion not only appears contrary to the medical record which specifically reflects a "psychiatric exam"

and states revelations from the "Mental Status Exam," *see* R. 1265, but also appears internally incon-

sistent with the next sentence of the ALJ's decision, which states in pertinent part that Plaintiff "was

experiencing significant life stress at the time of this evaluation," *see* R. 36.

The ALJ also did not directly address factors three (support for opinions in the medical

record) or four (consistency of the opinions with the record as a whole). Although the ALJ did note

that Plaintiff had a normal gait, station, and stability on the day that Dr. Rodgers prescribed a

wheelchair, she makes no effort to explain how that fact detracts from the opinions in the medical

source statement of Dr. Rodgers. *See* R. 35-36. That lone notation, furthermore, does not touch

upon the consistency of his opinions with the record as a whole.

In addition, the ALJ does not compare the opinions of Dr. Rodgers to any other medical

source, including Nurse King's supporting opinions. While the ALJ discounted the opinions of

Nurse King on grounds that Arlington Family merely treated Plaintiff for diabetes, R. 35, the admin-

istrative record shows much broader treatment by Arlington Family including treatment for back

problems, *see, e.g.,* R. 904-05 (back pain). That the ALJ mentioned that Plaintiff denied joint and

muscle pain and demonstrated no complications from her diabetes on the date Nurse King recorded

her opinions, *see* R. 35, does not exhibit consideration of support for the nurse's opinions or

consistency of the opinions with the record as a whole.

The ALJ also attempts to present the opinions of LCSW Kelso as not supported by the

evidence, but the ALJ inaccurately states that Plaintiff's symptoms were not expected to persist for

twelve consecutive months as required for disability. R. 36. The record shows that Dr. Grant diag-

nosed a major depressive disorder without psychotic features in February 2013 and noted that Plaintiff had experienced anxiety since 1999 and depression since her teenage years. R. 756, 759. The next month, Dr. Grant added a panic disorder diagnosis. R. 752. Although she did not see Plaintiff between April 2013 and February 2014, Dr. Grant made the same two diagnoses in 2014. R. 1265. She also noted that Plaintiff had no funds for a surgery and was off her prescribed medication. *Id.* In February 2014, LCSW Kelso assessed Plaintiff's mental RFC, rated her abilities to function in twenty categories as fair to poor and noted that the limitations would have been in effect prior to December 31, 2012. R. 1260-62. From these records, it is apparent that Plaintiff's symptoms lasted for at least a year.

Moreover, when the ALJ issued her decision in July 2014, she found that Plaintiff had two severe mental impairments at Step 2 of the sequential evaluative process. *See* R. 31. That step requires that the severe impairments meet the duration requirement set out in 20 C.F.R. §§ 404.1509, 416.909. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). In other words, unless the "impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." *Id.* §§ 404.1509, 416.909. The Step 2 finding of the ALJ appears internally inconsistent with discounting opinions of LCSW Kelso on grounds that Plaintiff's mental symptoms were not expected to last for the twelve months required for disability.

The ALJ procedurally erred in her consideration of the opinions of Plaintiff's treating physician. She also procedurally erred under SSR 06-03p in the evaluation of the opinions of the nurse and licensed clinical social worker. A procedural error does not require reversal and remand, however, unless the error affects the substantial rights of the claimant. *Snodgrass v. Colvin*, No. 11-CV-0219-P, 2013 WL 4223640, at *7 (N.D. Tex. Aug. 13, 2013) (citing *Taylor v. Astrue*, 706 F.3d 600,

29

603 (5th Cir. 2012)). To warrant reversal, the error must "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent the procedural error." *Ware v. Colvin*, No. 11-CV-1133-P, 2013 WL 3829472, at *4 (N.D. Tex. July 24, 2013) (citing *January v. Astrue*, 400 F. App'x 929, 933 (5th Cir. 2010) (per curiam)).

On the record before the Court, the failure to conduct the detailed analysis required by the regulations or to consider the opinions of the nurse and LCSW in accordance with SSR 06-03p is not harmless error. LCSW Kelso opined that Plaintiff's mental impairments would be more limiting than the mental RFC assessment of the ALJ. *Compare* R. 1260-62 *with* R. 33. Similarly, both Nurse King and Dr. Rodgers opined that Plaintiff could sit for no more than four hours, *see* R. 855, 1250, whereas the ALJ limited sitting to six hours, R. 33. Based on that medical opinion of Dr. Rodgers, Plaintiff did not possess the functional ability for a full-range of sedentary work. *See* Titles II & XVI: Determining Capability to do Other Work – The Medical-Vocational Rules of Appendix 2, SSR 83-10 (PPS-101), 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).

While the ALJ's mental RFC assessment may be supported by the opinions of Dr. Ritch, a non-examining agency consultant, *see* R. 93-95, and the ALJ's sitting limitation is supported by opinions of Dr. Hegde, a non-examining consultant, *see* R. 80, the ALJ did not rely on any state agency opinion in formulating her RFC assessment. She instead based her RFC determination on evidence not reviewed by the agency consultants and on a different interpretation of the evidence as reviewed the such consultants. R. 36.

When the ALJ made her mental RFC assessment, she had no opinion from a treating or

examining source that contradicted the opinions of LCSW Kelso. In addition, the ALJ rejected specific medical opinions of Dr. Rodgers related to Plaintiff's physical limitations. Rejecting medical opinions when there is no contrary opinion from a treating or examining source requires usurping the physician's role. *See Newton v. Apfel*, 209 F.3d 448, 453-58 (5th Cir. 2000). "That is neither the role of the ALJ nor this Court. Neither the courts nor ALJs may rely on their own medical opinions as to the limitations presented by a claimant's impairments." *Howeth v. Colvin*, No. 3:12-CV-0979-P, 2014 WL 696471, at *11 (N.D. Tex. Feb. 24, 2014) (citing *Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (per curiam decision reversing denial of benefits when the ALJ impermissibly relied on his own medical opinions as to limitations presented by the claimant's impairments). It is reversible error for ALJs to substitute their own medical opinions for those of a treating physician. *Evans v. Colvin*, No. 1:14-CV-202-BL, 2015 WL 9685552, at *3 (N.D. Tex. Dec. 8, 2015) (recommendation of Mag. J.), *adopted by* 2016 WL 112645 (N.D. Tex. Jan. 8, 2016).

Like *Newton*, "[t]his is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *See* 209 F.3d at 458. Even had the ALJ relied upon the opinions of Drs. Hegde or Ritch, such opinions do not constitute first-hand medical evidence, because they were formed on a second-hand basis from a review of then existing medical records. Like *Newton*, this is not "a case where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *See id.* Instead, the ALJ in this case rejected medical opinions of a treating physician (Dr. Rodgers) based only on opinions of a non-examining physician or on her own medical opinions as to Plaintiff's limitations cause by her impairments. The ALJ also rejected opinions of a nurse and licensed

clinical social worker without any contrary opinion from an examining or treating source.

The Commissioner in this case carried her Step 5 burden through testimony of a VE who identified light and sedentary jobs based upon the RFC assessed by the ALJ. Had the ALJ properly considered the medical opinions of Dr. Rodgers and the opinions of Nurse King, there is a realistic possibility that her physical RFC assessment would have changed. Likewise, had the ALJ properly considered the opinions of LCSW Kelso, there is a realistic possibility that her mental RFC assessment would have changed. The opinions of Dr. Rodgers, Nurse King, and LCSW Kelso support limitations greater than the RFC assessment. A change in the limitations within the questioning to the VE would cast doubt upon the existence of substantial evidence to support the ALJ's decision because to constitute substantial evidence to support a Step 5 finding of non-disability, testimony from a VE must include all limitations warranted by the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002); *Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001). Accordingly, to rely on the VE testimony to satisfy the Step 5 burden, the ALJ's hypothetical questioning would need to include all limitations warranted by the evidence.

The Court should find that the ALJ improperly considered and weighed the medical opinions of Dr. Rodgers and did not consider the opinions of Nurse King and LCSW Kelso in accordance with SSR 06-03p. There is no good cause to discount the weight of those opinions relative to any other expert. The ALJ failed to perform the detailed analysis required by 20 C.F.R. §§ 404.1527, 416.927 and failed to evaluate opinions of non-acceptable medical sources and explain the weight given to such opinions as set out in SSR 06-03p. Had she conducted that analysis and properly considered and weighed the opinions of the treating physician, nurse, and licensed clinical social worker there a realistic possibility that she would have altered her hypothetical to the VE to include greater limita-

tions than assessed in the current RFC. Consequently, the procedural error casts doubt on the

existence of substantial evidence to support the decision to deny benefits. Therefore, Plaintiff's

substantial rights have been affected by the ALJ's consideration and weight accorded to the opinions

of relevant medical sources in this case. This procedural error is not harmless and warrants remand.

## B. Appeals Council Review of the Evidence

Plaintiff contends that the Appeals Council ("AC") improperly evaluated the new and mater-

ial evidence submitted to it. Pl.'s Appeal at 15-16. Defendant contends that the submitted evidence

provides no basis to remand for further administrative proceedings. Def.'s Resp. at 14-17. She

argues: "Evidence submitted to the Appeals Council may be considered only to determine whether

the additional evidence satisfies the criteria for remand pursuant to sentence six of 42 U.S.C. §

405(g)." *Id.* at 15 (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1471 (5th Cir. 1989)). She goes on

to argue that both criteria for such remand – materiality and good cause – are lacking in this case.

*Id.* at 15-17.

The Commissioner completely misstates *Haywood*. The cited portion of *Haywood* addresses

a claimant's motion to supplement the record at the district court level – it makes no statement as

to the circumstances for considering evidence that the claimant submitted to the Appeals Council.

Thus, under the circumstances in *Haywood*, the court was "limited to determining whether to remand

for the consideration of the newly presented evidence." *See* 888 F.2d at 1471. Here, the AC has

already accepted the newly submitted evidence and made it a part of the administrative record of this

case. In such context, the AC is to "consider and evaluate any 'new and material evidence' that is

submitted, if it relates to the period on or before the ALJ's decision." *Sun v. Colvin*, 793 F.3d 502,

511 (5th Cir. 2015) (quoting 20 C.F.R. § 404.970(b)). The AC grants or denies a request for review

in accordance with regulations that "do not require the AC to provide a discussion of the newly submitted evidence or give reasons for denying review." *Id.*

Consequently, regardless of the parties' contentions, the district courts simply do not consider whether the Appeals Council properly considered the submitted evidence. The final decision of the Commissioner includes the denial of a request for review and any new evidence submitted to the AC. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). However, it is not the purpose of judicial review to decide whether the AC erred in denying a request for review. A denial of a request for review "becomes part of the Commissioner's final decision," but it is the ALJ's decision that remains binding on the claimant. *Sun*, 793 F.3d at 511. Accordingly, in the current context, "this court must examine all of the evidence, including the new evidence submitted to the AC, and determine whether the Commissioner's final decision to deny [the claimant's] claim was supported by substantial evidence." *Id.* at 510. However, given the reversible errors already discussed, the Court should find no need to consider whether substantial evidence supports the ALJ's decision independent of what has already been discussed.

## V.    CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court should find that (1) the ALJ improperly considered the medical opinions of Plaintiff's treating physician and (2) the ALJ failed to properly consider and weigh the opinions of the nurse practitioner and licensed clinical social worker in accordance with SSR 06-03p. The undersigned thus **RECOMMENDS** that the district court **REVERSE** Commissioner's decision to deny benefits and **REMAND** this case for further administrative proceedings. On remand the Commissioner shall properly consider the medical opinions of Dr. Rodgers and comply with SSR 06-03p for the other medical sources. If war-

34

ranted under 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1), the ALJ may re-contact a treating or other medical source or pursue other available options set out in those regulations.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

SO ORDERED this _9th_ day of February, 2017.

E. SCOTT FROST
UNITED STATES MAGISTRATE JUDGE